UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| WILLIAM S., [1] | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:24-CV-00116 |
| | § | |
| MARTIN J O'MALLEY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff William S. ("William") filed this action pursuant to 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security ("the Commissioner") to deny his application for Social Security disability benefits. Now pending are William's and the Commissioner's construed cross-motions for summary judgment. (D.E. 20, 26, 29). William contends, first, that the residual functional capacity ("RFC") determination was not supported by substantial evidence because the Administrative Law Judge ("ALJ") failed to properly address several medical opinions in the record and, second, that the ALJ erred at step five of the sequential evaluation because the jobs he identified do not exist in significant numbers in the national economy. For the reasons discussed further below, it is recommended that William's motion (D.E. 20) be **GRANTED in part and DENIED in**

---

[1] Pursuant to the May 1, 2018, "Memorandum Re: Privacy Concern Regarding Social Security and Immigration Opinions" issued by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, this memorandum uses only Plaintiff's first name and last initial.

**part**, the Commissioner's motion (D.E. 26) be **GRANTED in part and DENIED in part**, and the Commissioner's denial of disability benefits be **REVERSED AND REMANDED** for further consideration.

## I. JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security and venue is appropriate because William resides in Nueces County, Texas. 42 U.S.C. § 405(g); 28 U.S.C. § 124(b)(6).

## II. BACKGROUND & ADMINISTRATIVE RECORD

### a. Application and Hearing

In December 2022, William filed an application for disability insurance benefits, alleging a disability commencing on June 24, 2022. (D.E. 6-6 at 5). William claimed that his lumbar sacral strain, arthritis and degeneration in his spine, neuropathy in his legs, sciatica, sleep apnea, post-traumatic stress disorder ("PTSD"), hip strain, depression, and anxiety limited his ability to work. (D.E. 6-7 at 27). The Commissioner denied William's application both initially and on reconsideration. (D.E. 6-4 at 2, 12).

In the Disability Determination Explanation at the initial stage, state medical consultant Dr. Mark Schade concluded that William had severe impairments consisting of lumbar spinal stenosis, trauma-and-stressor-related disorders, osteoarthritis and allied disorders, and anxiety and obsessive-compulsive disorders. (*Id.* at 5). When considering the Paragraph B criteria, Dr. Schade concluded that William had a moderate limitation in his ability to concentrate, persist, or maintain pace, and mild limitations in all other areas

of mental functioning. (*Id.* at 6). In his mental RFC determination, Dr. Schade concluded that William had moderate limitations in various areas of mental functioning, along with a marked limitation in his ability to carry out detailed instructions. (*Id.* at 9). He concluded that William could "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work setting." (*Id.*).

In the Disability Determination Explanation at the reconsideration stage, state medical consultant Dr. Jermaine Robertson concluded that William had the same severe impairments. (*Id.* at 15). Dr. Robertson's conclusions when considering the Paragraph B criteria were also the same as Dr. Schade's. (*Id.*). In his mental RFC determination, Dr. Robertson concluded that William had moderate limitations in various areas of mental functioning, but did not find any marked limitations. (*Id.* at 19). He concluded that William could "understand, retain, and carry out simple, as well as some complex/detailed instructions. Claimant can consistently and usefully perform routine tasks on a sustained basis, with normal supervision, and can cooperate effectively with public and co-workers in completing simple, as well as some complex/detailed tasks and transactions. Claimant can adjust to the mental demands of most new task settings." (*Id.* at 20).

The ALJ held a hearing on March 4, 2024, at which William testified to the following. (D.E. 6-3 at 41). He had difficulty grocery shopping due to anxiety and paranoia, so he tried to shop as little as possible. (*Id.* at 51). He took medication for

depression and anxiety, along with other medication for his physical impairments. (*Id.* at 51-52). These medications caused side-effects, including memory issues. (*Id.* at 52). He had difficulty concentrating and focusing on things he tried to accomplish and became overwhelmed when thinking about completing tasks. (*Id.* at 54). He experienced significant mood swings, but he could not determine what caused them. (*Id.* at 54-55). He had significant memory loss. (*Id.* at 55). He also had difficulty getting along with other people because he was easily irritated and frustrated. (*Id.*). Even considering only his mental health impairments, William did not believe he could reliably work every day. (*Id.* at 59). He had difficulties before he was let go from his previous job, including sitting in his car for 20 minutes because he could not get himself to leave the driveway, missing days, and having difficulty with criticism and feedback. (*Id.* at 59-60). His paranoia caused him to feel like he was constantly being watched. (*Id.* at 60).

A vocational expert identified William's past relevant work as technical support and network control operator. (*Id.* at 61). The ALJ asked the vocational expert whether there was work in the national economy for a person with the same age, educational history, and work history as William who could perform sedentary work, with additional limitations including: (1) occasional climbing of ramps and stairs; (2) no climbing of ladders, ropes, or scaffolds; (3) occasional balancing, stooping, kneeling, crouching, and crawling; (4) understanding, remembering, and carrying out only simple, routine instructions; and (5) making only simple work-related decisions. (*Id.* at 61-62). The vocational expert testified that such a person could not perform William's past work, but they could perform

other jobs such as surveillance system monitor, office worker, and order clerk. (*Id.* at 62). Within the national economy, there were 153,000 office worker jobs, and 105,000 order clerk jobs. (*Id.*). If the person would be off-task 15 percent of the workday, absent two days per month, or would need frequent supervision throughout the workday, such a person could not find work in the national economy. (*Id.* at 63). The job numbers provided by the vocational expert were specific to the Dictionary of Occupational Titles ("DOT") entries, and the data came from Job Browser SkillTRAN. (*Id.* at 63-64).

On March 20, 2024, William filed an objection to the vocational expert's testimony regarding a conflict between the ALJ's hypothetical, which limited the person to simple tasks, and the vocational expert's testimony, which included jobs with a reasoning level of 3. (D.E. 6-7 at 115-16).

On March 31, 2024, William filed a second objection to the vocational expert's testimony. (*Id.* at 117-22). He argued that although the vocational expert testified that her job numbers were DOT-specific, the numbers were inflated and instead appeared to be based on an undefined, wider classification group. (*Id.* at 117). Further, he argued that although the vocational expert testified that she obtained the job numbers from Job Browser SkillTRAN, the numbers in that software were not consistent with the vocational expert's testimony. (*Id.* at 117-18). Instead, William argues that the program estimated only 921 total jobs for the position of charge-account clerk, DOT 205.367-014. (*Id.* at 118). Similarly, he argued that the program estimated only 1,139 total jobs for the position of order clerk, DOT 209.567-014. (*Id.* at 119). He contended that this was a stark contrast

from the vocational expert's testimony that there were 153,000 and 105,000 jobs for those positions.  (*Id.* at 120).

### b.  Medical Records and Function Reports

On December 28, 2021, William visited Licensed Professional Counselor ("LPC") Dr. Nephaterria Harris for a mental health consultation.  (D.E. 6-9 at 519).  William sought a PTSD evaluation and had concerns about attention-deficit/hyperactivity disorder ("ADHD").  (*Id.* at 520).  He reported severe irritation, frustration, paranoia, and anger that made it difficult for him to focus.  His anger was not directed at anything, but it was triggered while around other people and when he felt overwhelmed.  He also had difficulty with sleeping and nightmares.  (*Id.*).  William reported that he experienced a commander in the military who was vindictive and aggressive about structure, and as a result, he had a problem with authority and did not like structure.  (*Id.* at 521).  His mental status examination was normal.  (*Id.*).  William sought and received a referral for individual psychotherapy.  (*Id.* at 522).

On December 29, 2021, William visited Dr. Derek Bacchus, a psychologist, to establish care for PTSD and depression.  (*Id.* at 500).  William reported a difficult transition after moving to Texas three months earlier.  (*Id.* at 501).  He was overwhelmed, had difficulty completing tasks, lacked motivation, and had significant memory and attention concerns.  His difficulties with memory and attention extended back to his childhood, but mental health medications he took as an adult made them worse.  William also reported anxiety symptoms due to his time in the military, including abusive commanding officers.

He avoided people who annoyed him at work, along with crowds and grocery stores because they caused him to experience unexplained rage and muscle tightness. He also had issues with authority figures. (*Id.*). William reported difficulty sleeping related to sleep apnea, although he also suffered from nightmares. (*Id.* at 502). He had a very low appetite. (*Id.*). He had low energy, partially due to not enjoying his job. (*Id.* at 503). William's mental status examination was normal other than that his mood was frustrated. (*Id.* at 505). Dr. Bacchus diagnosed him with adjustment disorder with mixed anxiety and depressed mood, history of childhood emotional abuse, and relational distress. (*Id.*).

On January 19, 2022, William visited Dr. Mohen Bohjwani, a psychiatrist, on a referral to treat his severe depression. (*Id.* at 475-76). William's reports were consistent with what he told Dr. Bacchus. (*Id.* at 476). A mental status examination showed average cognition, inconsistent eye contact, a depressed and labile mood, average intellectual functioning, poor insight, and fair judgment and reliability. (*Id.* at 477). Dr. Bohjwani diagnosed him with an unspecified mood disorder. (*Id.*). He prescribed William medication to treat his depression, anxiety, anger, and inattention. (*Id.* at 478).

On February 11, 2022, William visited Susan Payvar, a psychologist, regarding his chronic pain. (D.E. 6-8 at 194). William's mental status examination was normal, except that he had a dysphoric mood. (*Id.* at 195). His insight and judgment were good. (*Id.*).

On April 19, 2022, William returned to Dr. Bohjwani and reported drastic improvement with his attention problems. (*Id.* at 159). However, he reported that he was still mildly depressed and anxious most of the time. He still had difficulty sleeping, even

with medication, although it was improved since the last visit. (*Id.*). His mental status examination was normal, except that his mood was mildly depressed. (*Id.* at 160).

On July 1, 2022, William visited Kristen Barber-Goins, a psychologist, for treatment of his depression. (*Id.* at 132-33). William reported that he sometimes got extremely angry or sad, but he did not understand why. (*Id.* at 133). He sometimes felt like he was being judged in public. He could not accomplish any tasks and felt this problem was occurring more frequently. He struggled to get out of bed and had lost his job because he missed too many days. (*Id.*).

On July 21, 2022, William visited Dr. Chris Tokunaga, a psychiatrist, regarding his depression, anxiety, and ADHD. (*Id.* at 118). William reported that the medication initially helped, but that his depression was making it difficult to function, his mood had declined, and his anxiety increased. His anxiety was worse in public, but he also experienced it at home. He had a low frustration tolerance and felt short-tempered and angry. He rated his mood as a 4 out of 10. His sleep issues had also gotten worse, he had little appetite, and his energy level was poor. (*Id.*). William's mental status examination was normal, except that he had a dysphoric mood. (*Id.* at 119). Dr. Tokunaga diagnosed him with major depressive disorder, insomnia, anxiety disorder, irritability and anger, and an adjustment disorder with mixed anxiety and depressed mood. (*Id.* at 120). He continued William's previous medication and prescribed a new medication. (*Id.*).

William returned to Dr. Tokunaga on September 27, 2022. (*Id.* at 104). His sleep had improved, his appetite had improved, and he had more energy. (*Id.*). His mood

remained dysphoric. (*Id.* at 105). Dr. Tokunaga discontinued one medication but prescribed a new medication in its place. (*Id.* at 106).

On January 5, 2023, William visited Jennifer Charles, a Licensed Marriage and Family Therapist, regarding interest in individual therapy. (*Id.* at 51). William reported a lack of energy, moments of rage, low self-esteem, and difficulty with authority. (*Id.* at 52). He was sleeping around 7 hours a day, but he still had nightmares a couple of times a week. His appetite had increased. (*Id.*). His mental status examination showed a flat affect and congruent mood, and he displayed limited insight and judgment. (*Id.* at 55).

On January 12, 2023, William visited Dr. Krystal Rufus, a clinical pharmacy specialist, for a medication management follow-up. (*Id.* at 65). He reported that he was doing alright. Medication had helped him sleep and had improved his concentration some. He was still experiencing issues with irritability, depression, and anxiety. (*Id.*). His mental status examination was normal except that his affect was slightly constricted. (*Id.* at 66-67). William noted that stressors had caused some of his symptoms to worsen and was interested in medication adjustments. (*Id.* at 67). Dr. Rufus increased his dosage of a medication to help his mood and continued his other mental health medications. (*Id.*).

In a February 12, 2023, function report, William's wife reported the following. (D.E. 6-7 at 36-47). Due to his ADHD and depression, William needed reminders to take care of personal needs, grooming, and medications. (*Id.* at 42). He sometimes made his own meals, but on bad days, even making basic meals was a struggle. He did not do household chores. (*Id.*). On a good day, William accompanied her on errands, and he

could drive or ride in a car. (*Id.* at 43). He could sometimes go out alone. He shopped in stores and online sometimes. William could handle money. (*Id.*). His hobbies included watching movies, reading, and crafting, but he could no longer go dancing or do outdoor activities like he used to. (*Id.* at 44). William spent time with others in person, on the phone, over email, and by text, but they rarely went out to socialize anymore. He sometimes needed to be reminded to go places, mostly doctor's appointments. (*Id.*). He did not have trouble getting along with other people because he would never show them his depression, but he was depressed, anxious, and had low energy. (*Id.* at 45). Along with physical limitations, his mental impairments and medications affected his memory, concentration, and ability to complete tasks. He only sometimes finished what he started and had difficulty following lists or directions. (*Id.*). He could not handle stress and regularly had meltdowns or shut down when put in overwhelming situations. (*Id.* at 46).

In a February 20, 2023, function report, William reported the following. (*Id.* at 60-67). His depression and anxiety made it difficult for him to leave his house for work or to get along with his bosses. (*Id.* at 60). His medications affected his memory, made it difficult to drive, and made him tired, which also affected his depression and his ability to complete tasks. (*Id.*). He had no problem with personal care, but he did not believe he would take care of himself if his wife was not there. (*Id.* at 61). His wife had to remind him to brush his teeth and wash properly. (*Id.* at 62). She also reminded him to take medications. William prepared his own meals, but mostly ate premade meals. He folded laundry and washed dishes at home, but his wife had to encourage him. (*Id.*). He left the

house daily to go to school, but his wife drove more than half the time. (*Id.* at 63). He shopped once every two weeks in stores and by computer for groceries and art supplies. He could pay bills and handle a savings account, but he could not count change or use a checkbook. His ability to handle money was affected by his conditions because he found it difficult to stay within a budget. (*Id.*). His hobbies included reading, dancing, art, and being outdoors, but it was difficult to dance or be outdoors due to his physical impairments, and hard to focus on his art. (*Id.* at 64). He spent time with people in person and on the phone, including talking with his friend on the phone and playing games with him online. He had difficulty getting along with other people. (*Id.*).

William further stated that, along with physical limitations, his mental impairments affected his memory, concentration, understanding, ability to complete tasks, and ability to get along with others. (*Id.* at 65). He could concentrate for two minutes. He could follow written instructions better than spoken instructions because he had difficulty remembering what he was told. He had a difficult time get along with authority figures. (*Id.*). He did not handle stress well because he became overloaded and shut down. (*Id.* at 66). Changes in routine caused his anxiety to flare up and made him get angry. He had also noticed that he became angry for no reason when driving. (*Id.*).

On February 16, 2023, William visited Jeremy Barrera Gonzalez, a counselor, for psychotherapy. (D.E. 6-9 at 283). His mental status examination was normal, except that he had a flat mood. (*Id.* at 284). When William returned on February 28, 2023, his mood

was flat and depressed. (D.E. 6-8 at 662). When he returned on March 23, 2023, his mood was flat. (*Id.* at 653).

On March 31, 2023, William visited Jeri Sowell Rath, a licensed clinical social worker ("LCSW"), for further treatment of his anxiety and depression. (D.E. 6-9 at 261). His mental status examination was normal, except that his mood was anxious. (*Id.* at 262). William recounted the same environmental stressors, sleep problems, memory problems, unpredictable rage, and lack of motivation as in previous appointments. (*Id.*). A depression test indicated that William had moderately severe depression. (*Id.* at 264-65).

On April 4, 2023, William visited Dr. Michael Heffernan for a consultative psychological examination. (D.E. 6-8 at 606-09). Dr. Heffernan recounted that William had difficulty with memory and concentration, needed significant assistance in completing activities of daily living, and had to be accompanied when he left the house. (*Id.* at 607). William had difficulty in social interactions and avoided people whenever possible. He failed all areas of a mental status examination, including concentration, memory, and reasoning. During the examination, although William maintained adequate eye contact and effort, and his speech was at a normal rate, spontaneous, and intelligible, he was visibly anxious with hand tremors and restlessness. His thoughts and perceptions were normal. However, he had an anxious facial expression, was tense, spoke with voice strain, and had frequent bouts of panic. His panic attacks occurred when he could not complete tasks and when he had PTSD flashbacks to his abusive commanding officers in the military. William's affect during the examination was constricted. (*Id.*). Dr. Heffernan estimated

William's intelligence, including abstract thinking and reasoning, to be below normal limits. (*Id.* at 608). Similarly, based on William's own reports and tests conducted at the visit, Dr. Heffernan concluded that his memory and concentration were below normal limits. William was able to properly answer a question related to judgment and was aware of his concentration and memory problems. (*Id.*).

Based on William's mental status examination, activities of daily living, and work history, Dr. Heffernan believed he would have difficulty completing works-related tasks over a sustained period and functioning normally in employment-related settings. (*Id.*). The expected outcome of treatment was poor. (*Id.* at 609). Dr. Heffernan diagnosed William with panic disorder and PTSD. Regarding William's functional capacity, Dr. Heffernan concluded that:

> [He] is <u>not able</u> to understand instructions involving job-related tasks. He is <u>not able</u> to apply information, and carry out instructions involving job-related tasks. He is <u>not able</u> to remember job instructions. He is <u>not able</u> to sustain concentration and persist in work-related activity at a reasonable pace. He is <u>not able</u> to maintain effective social interaction consistently, with supervisors, co-workers, and the public. He is <u>not able</u> to deal with normal pressures in a competitive work setting.

(*Id.*) (emphasis in original) (internal parentheticals omitted). Finally, Dr. Heffernan concluded that William was not able to manage benefit payments in his interest, but he could understand the meaning of filing for benefits. (*Id.*).

On April 26, 2023, William visited LCSW Rath. (D.E. 6-9 at 256). His mental status examination was normal, except for that his mood was anxious. (*Id.* at 258). William discussed significant difficulty feeling motivated to complete tasks. (*Id.* at 259). William

13

returned to LCSW Rath on May 15, 2023, and his mental status examination was normal, except that his mood was somewhat defeated. (*Id.* at 245-46). The same was true on June 8, 2023. (*Id.* at 233-34). However, at appointments on June 22, June 29, July 13, July 19, August 21, September 29, and October 13 his mood was relaxed. (*Id.* at 188, 203, 222, 225). In 12 depression screenings conducted between February 2022 and August 2023, William ranged from moderately severe depression to severe depression. (*Id.* at 145). Similarly, in seven anxiety screenings conducted between January 2023 and July 2023, William ranged from moderate anxiety to severe anxiety. (*Id.*).

In a June 27, 2023, function report, William reported limitations consistent with his previous function report. (D.E. 6-7 at 68-75). However, he further reported difficulty dressing, needing help from his wife to wash effectively, and using the toilet being difficult on bad pain days. (*Id.* at 69). He set alarms and calendar events on his phone to remember to take care of personal needs, grooming, and medications. (*Id.* at 70).

On July 14, 2023, William visited nurse practitioner Krishnakumar Parameswran for a psychiatry appointment. (D.E. 6-9 at 189). William sought medication for his ADHD and anxiety. (*Id.* at 191). Screenings showed moderate depression and moderate anxiety. (*Id.* at 194). His mental status examination was normal, except that his mood was dysphoric and anxious. (*Id.* at 194-95). Nurse Parameswran continued his mental health medications and prescribed an additional medication for anxiety. (*Id.* at 195). William returned to Nurse Parameswran on October 13, 2023, and reported that new medication he was taking for his ADHD had helped his focus and concentration. (*Id.* at 138). William

denied major depression or anxiety but stated that he had transient depression and anxiety on a situational basis. (*Id.* at 139). His mental status examination was normal. (*Id.* at 140-41). Nurse Parameswran continued all medications. (*Id.* at 142).

On November 2, 2023, William visited Dr. Silvana Montautti, a psychiatrist, and reported that medication was still helping with his focus, but he continued to have anxiety symptoms and a fluctuating mood. (*Id.* at 123). His mental status examination was normal. (*Id.* at 125-26). William continued to have symptoms of depression and anxiety that were not well controlled. (*Id.* at 126). Dr. Montautti increased the dosage of one of William's medications. (*Id.* at 127). William returned to Dr. Montautti on December 7, 2023, and reported that he felt the increased dosage had stabilized his mood, although other stressors had caused his depression and anxiety to increase. (*Id.* at 97). The medication for his ADHD continued to be effective. (*Id.*). His mental status examination was normal. (*Id.* at 98-99). Dr. Montautti continued his prescriptions at the same dosages. (*Id.* at 100). On January 4, 2024, William reported to Dr. Montautti that he was doing well, although he was having some side effects from a prescription. (*Id.* at 69-70). However, the other medication was working well. (*Id.* at 70). His mental status examination was normal. (*Id.* at 71-72). Dr. Montautti concluded that William was stable on his medication regime and that no changes were needed. (*Id.* at 72-73). The same was true on February 2, 2024, although William was having blood pressure issues that could require an alternative antidepressant treatment. (*Id.* at 62-63).

*c. ALJ Decision*

On April 4, 2024, the ALJ issued an opinion, concluding that William was not under a disability since June 24, 2022. (D.E. 6-3 at 18-33). At the first step of the sequential evaluation process, the ALJ concluded that William had not engaged in substantial gainful activity since June 24, 2022. (*Id.* at 21). At the second step, the ALJ concluded that William had several severe impairments, including disorders of the lumbar and cervical spines, chronic pain syndrome, chondromalacia of the bilateral knees, major depressive disorder, panic disorder, ADHD, and PTSD. (*Id.*).

At the third step, the ALJ concluded that William did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.* at 22-23). When considering the Paragraph B criteria, the ALJ determined that William had a moderate limitation in understanding, remembering, or applying information. (*Id.* at 23). He noted that the evidence showed "intelligence below normal limits, abstract thinking and reasoning below normal limits, memory below normal limits, and limited insight and judgment; however, it generally shows average intellect, logical thought process, adequate fund of knowledge, good insight, and good judgment." (*Id.*). The ALJ determined that William had a moderate limitation in concentrating, persisting, or maintaining pace. (*Id.* at 24). He noted that the evidence showed "anxious and depressed mood, concentration below normal limits, and restless psychomotor activity; however, it generally shows good attention, good concentration, unremarkable psychomotor activity, unremarkable thought content, no perceptual

abnormalities, and full orientation." (*Id.*). Finally, the ALJ found that William had mild limitations in interacting with others and adapting or managing himself. (*Id.* at 23-24).

The ALJ concluded that William had the RFC to complete sedentary work, with additional limitations including: (1) occasional climbing of ramps and stairs, but no climbing of ladders, ropes, or scaffolds; (2) occasional balancing, stooping, kneeling, crouching, and crawling; (3) understanding, remembering, and carrying out only simple, routine instructions; and (4) making only simple work-related decisions. (*Id.* at 25). The ALJ stated that William's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the evidence in the record. (*Id.* at 26).

As to William's mental impairments, the ALJ stated that the record showed major depressive disorder, panic disorder, ADHD, and PTSD, but also showed overall intact cognitive, social, and adaptive functioning. (*Id.* at 27). The ALJ noted that William reported difficulties following instructions, remembering, concentrating, and getting along with others, among other things, in his most recent function report, but also reported that he could follow written instructions, drive, shop, spend time with others, and complete other activities of daily living. The ALJ further noted that the medical evidence showed conservative recommendations, effective treatments, and only mild to moderate objective findings. (*Id.* at 27-28).

When discussing Dr. Heffernan's mental status examination, the ALJ stated that it "showed intelligence below normal limits, abstract thinking and reasoning below normal limits, memory below normal limits, anxious mood, constricted affect, concentration below normal limits, and restless psychomotor activity; nevertheless, it also showed intact thought associations, adequate eye contact, normal speech, unremarkable thought content, no perpetual abnormalities, no abnormal psychomotor activity, appropriate attire, normal grooming, and no noted loss of insight or judgment." (*Id.* at 28). The ALJ stated that other mental status examinations similarly showed mixed results. (*Id.*). The ALJ acknowledged that Dr. Heffernan found that William had "extreme limitations in all four areas of mental functioning, with no ability to perform any cognitive, social, or adaptive activities." (*Id.* at 28-29). However, the ALJ concluded that Dr. Heffernan did not support the connection between the mixed objective findings and the extreme assessed limitations. (*Id.* at 29). The ALJ also found the extreme limitations to be inconsistent with the other medical evidence in the record. Accordingly, he found Dr. Heffernan's opinion to be unpersuasive. (*Id.*).

With regard to the state agency psychological consultants, the ALJ found their opinions generally persuasive. (*Id.*). He noted that both consultants found that William was limited to understanding, remembering, and carrying out simple instructions or tasks and to making simple decisions. The ALJ disagreed with the consultants' opinions assessing only a mild limitation to William's ability to understand, remember, or apply information, instead concluding that William had a moderate limitation due to evidence

"showing intelligence below normal limits, abstract thinking and reasoning below normal limits, and memory below normal limits." (*Id.*).

At step four, the ALJ concluded that, based on his RFC, William was not able to perform his past relevant work. (*Id.* at 30-31). However, at step five, the ALJ concluded that William could perform other jobs in the national economy, including office worker and order clerk. (*Id.* at 31-32). The ALJ discussed William's first objection to the vocational expert's testimony, but did not address his objection regarding whether these positions existed in significant numbers in the national economy. (*Id.* at 32). Thus, the ALJ concluded that William was not under a disability from June 24, 2022, through the date last insured. (*Id.* at 33).

The Appeals Council denied William's request for review of the ALJ's decision. (*Id.* at 2-4).

## III. DISCUSSION

### a. *Whether the ALJ properly explained his rejection of Dr. Heffernan's opinion*

In his motion for summary judgment, William first contends that the ALJ improperly rejected Dr. Heffernan's opinion regarding his mental limitations. (D.E. 20 at 5-6). William argues that the ALJ merely stated in a conclusory fashion that Dr. Heffernan's opinions were not supported by his objective findings or consistent with the record as a whole, but he did not identify any specific exam findings that were not supported or inconsistent. (*Id.* at 6). William asserts that the ALJ improperly substituted

his lay opinion when formulating the RFC rather than relying on Dr. Heffernan's medical opinion. (*Id.* at 6-7).

The Commissioner responds that the ALJ properly addressed the consistency and supportability of Dr. Heffernan's opinion, including inconsistencies between Dr. Heffernan's examination findings and his ultimate opinion. (D.E. 26 at 8-9). Similarly, the Commissioner argues that the ALJ cited various other medical records that were inconsistent with Dr. Heffernan's opinion regarding William's limitations. (*Id.* at 9). The Commissioner argues that the ALJ thoroughly explained why he found Dr. Heffernan's opinion to be unpersuasive and properly relied on the other medical evidence in the record in crafting the RFC. (*Id.* at 9-10).

William replies that the ALJ improperly interpreted the raw medical evidence, misrepresented Dr. Heffernan's opinion, and failed to provide any explanation beyond a conclusory statement for finding that Dr. Heffernan's opinions were not supported by his examination findings. (D.E. 29 at 2-5). He argues that this resulted in a legally insufficient RFC assessment. (*Id.* at 6).

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The burden has been described as more than a scintilla, but lower than a

preponderance. *Id.* On review, the Court may not reweigh the evidence, and it is the ALJ's responsibility to resolve conflicts in the evidence, not the Court's. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995). "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether: (1) the claimant is participating in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work. *Martinez*, 64 F.3d at 173-174; 20 C.F.R. §§ 404.1520(a)(4). The claimant bears the burden of proof on the first four steps, with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

RFC, which is determined between the third and fourth steps, is the most a claimant can do despite their limitations. 20 C.F.R. § 404.1545(a); *Perez*, 415 F.3d at 461-62. When assessing a claimant's RFC, the ALJ must consider all relevant medical and other evidence, including statements by the claimant and their family members regarding the limitations that result from their symptoms. 20 C.F.R. § 404.1545(a)(3). When creating the RFC, the ALJ must consider all a claimant's medically determinable impairments. *Id.*

§ 404.1545(a)(2). "[T]he determination of residual functional capacity is the sole responsibility of the ALJ." *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012).

The ALJ does not defer or give any specific evidentiary weight to any medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(a). The ALJ considers several factors when evaluating medical opinions, including: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors as applicable. *Id.* § 404.1520c(c). The most important factors when evaluating persuasiveness are supportability and consistency. *Id.* § 404.1520c(a). "Supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). "Consistency" means that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). The ALJ must articulate how persuasive they find all of the medical opinions and prior administrative medical findings in the record. *Id.* § 404.1520c(b). The ALJ must address supportability and consistency, but the other factors are optional. *Id.* § 404.1520c(b)(2).

An ALJ may not, without opinions from medical experts, "derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical

conditions." *Esther D. J. v. Kijakazi*, No. 5:20-CV-239, 2022 WL 5434335, at \*4 (S.D. Tex. Aug. 3, 2022). An RFC determination lacks substantial evidence "where it is not supported by any medical opinion and is, instead, based on the ALJ's lay interpretation of raw medical data." *Id.*

When assessing a claimant's RFC, the ALJ must consider all relevant medical and other evidence, including statements by the claimant and their family members regarding the limitations that result from their symptoms. 20 C.F.R. § 404.1545(a)(3). When the ALJ determines that a claimant has a medically determinable impairment that "could reasonably be expected to produce" their symptoms, he "must then evaluate the intensity and persistence of [their] symptoms" to determine how they limit the claimant's capacity to work. *Id.* § 404.1529(c)(1). This requires consideration of "all of the available evidence from … medical sources and nonmedical sources about how [the claimant's] symptoms affect [them]." *Id.* "[I]mpairments that reasonably can be remedied or controlled by medication or treatment are not disabling." *Brunson v. Astrue*, 387 F. App'x 459, 461 (5th Cir. 2010).

Here, the ALJ adequately explained his rejection of Dr. Heffernan's opinion, and his conclusion that the opinion was unpersuasive was supported by substantial evidence. When discussing Dr. Heffernan's opinion, the ALJ addressed both the supportability and consistency factors. As to supportability, the ALJ stated that the extreme limitations Dr. Heffernan found were not supported by his objective findings, which showed "intact thought associations, adequate eye contact, normal speech, unremarkable thought content,

no perpetual abnormalities, no abnormal psychomotor activity, appropriate attire, normal grooming, and no noted loss of insight or judgment." (D.E. 6-3 at 29). The ALJ noted that Dr. Heffernan did not explain why he found William's limitations to be so severe despite the many positive objective findings in his own examination. As to consistency, the ALJ stated that the other evidence in the record did not support such severe limitations because it showed "no psychiatric hospitalizations, average intellect, logical thought process, intact memory, good eye contact, cooperative behavior, normal speech, euthymic mood, affect congruent with mood, broad and appropriate affect, good attention, good concentration, unremarkable psychomotor activity, unremarkable thought content, no perceptual abnormalities, full orientation, appropriate attire, appropriate grooming, adequate fund of knowledge, good insight, and good judgment." The ALJ provided specific record citations in support of this conclusion. (*Id.*).

The ALJ's conclusions regarding both supportability and consistency were supported by substantial evidence. As to supportability, the ALJ correctly noted the several positive objective findings during Dr. Heffernan's examination, including adequate eye contact, adequate effort, normal and spontaneous speech, normal thoughts and perceptions, and no loss of insight or judgment. (D.E. 6-8 at 607-08). Dr. Heffernan did not explain why, despite these normal findings, he ultimately concluded that William would be unable to complete any work activities. (*Id.* at 609). As to consistency, no other medical record in the evidence supports the extreme limitations found by Dr. Heffernan. Across various other mental health providers, William's mental status examinations were largely normal

24

outside of a range of moods.  (D.E. 6-8 at 66-67, 119, 160, 195; D.E. 6-9 at 71-72, 98-99, 125-26, 140-41, 188, 194-95, 203, 222, 225, 233-24, 258, 262, 284, 505, 521).  William was treated primarily with medication and often reported that it helped his symptoms.  (D.E. 6-8 at 65, 159; D.E. 6-9 at 70, 72-73, 97, 123, 138).  Moreover, several of Dr. Heffernan's identified limitations, such as his conclusion that William could not manage his own benefits, exceeded even William's and his wife's own claimed limitations.  (D.E. 6-7 at 43, 63).  Further, as discussed more below, the opinions of the state agency consultants were not consistent with the severe limitations found by Dr. Heffernan, instead finding that William was limited to carrying out simple instructions but was able to complete most other job-related tasks.  (D.E. 6-4 at 9, 20).  In short, while there is some evidence in the record supporting greater limitations, the ALJ properly addressed the supportability and consistency of Dr. Heffernan's opinion, and his conclusions were supported by substantial evidence in the record.

> **b.** *Whether the ALJ properly addressed the limitations found by the state agency consultants in the RFC and applied those limitations at step five*

William next argues that the state agency medical consultants, Dr. Schade and Dr. Robertson, both found that he had mental limitations in various areas of mental functioning and that the ALJ stated that he found their opinions persuasive.  (D.E. 20 at 9-10).  William contends that, despite this finding, the RFC did not include any of the social limitations found by Dr. Robertson.  (*Id.* at 10).  William argues that the ALJ did not explain this discrepancy, and the jobs he identified as available for William involved significant social interaction.  (*Id.* at 10-12).  Similarly, William contends that, although the RFC limited

him to carrying out only simple, routine instructions, this did not clearly apply Dr. Schade's conclusion that William could not carry out detailed instructions. (*Id.* at 12-13). William argues that the ALJ also failed to explain this discrepancy, and the jobs he identified require carrying out detailed instructions. (*Id.* at 13-14). William asserts that, because the ALJ did not properly explain why the RFC did not contain all limitations found by Dr. Robertson and Dr. Schade, it is impossible to determine whether the RFC was supported by substantial evidence. (*Id.* at 14-15).

The Commissioner responds that the ALJ found the opinions of Dr. Schade and Dr. Robertson only generally persuasive, including finding more extensive limitations than they did in William's ability to understand, remember, and apply information, and to concentrate, persist, or maintain pace. (D.E. 26 at 11-12). The Commissioner argues that the ALJ properly considered the medical record as a whole in reaching the RFC determination and was not required to adopt the opinion of any medical source. (*Id.* at 12-13). Finally, the Commissioner contends that the ALJ's RFC determination was consistent with the opinions of Dr. Schade and Dr. Robertson anyway. (*Id.* at 13-14).

William replies that the ALJ failed to account for the moderate limitation in his ability to concentrate, persist, or maintain pace that the ALJ found at step three of the sequential evaluation. (D.E. 29 at 7-8). He argues that both Dr. Schade and Dr. Robertson found limitations in his ability to concentrate, persist, or maintain pace, and the ALJ did not explain why no limitations were necessary in the RFC. (*Id.* at 8-9).

While "the DOT provides standardized probabilistic analyses of certain jobs' requirements," a vocational expert's testimony "is claimant-specific." *Pulley v. Comm'r of Soc. Sec.*, No. 4:21-CV-01159-O-BP, 2022 WL 1694436, at *9 (N.D. Tex. May 13, 2022). Thus, an ALJ "should rely on the VE's assessment of a claimant's ability to work a job, not the putatively conflicting DOT guidelines for that job." *Id.* Accordingly, "even if the ALJ limited consideration to 'simple' jobs" and the vocational expert identified jobs that usually have a higher reasoning level, the vocational expert's "answer controls 'provided that the record reflects an adequate basis' for the ALJ's reliance." *Id.*

As defined by the DOT, reasoning at level 3 requires "the ability to '[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.'" *Martin v. Saul*, No. 5-19-CV-00573-FB-RBF, 2020 WL 4382133, at *4 (W.D. Tex. July 30, 2020) (citing DOT Appendix 3). Reasoning at level 2 "requires the ability to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.'" *Id.* Both jobs identified by the ALJ at step five have reasoning levels of 3. D.O.T. 205.367-014, 209.567-014. In *Martin*, the ALJ concluded that the claimant was limited to "simple jobs that are not detailed or complex jobs," but concluded at step five that she could perform other jobs that had a reasoning level of 3. *Martin*, 2020 WL 4382133 at *2-3. The court noted that this issue was not addressed or resolved by either the vocational expert or the ALJ. *Id.* at *5. Accordingly,

the court concluded that "the probative value of the vocational expert's testimony is so lessened that remand for lack of substantial evidence should follow." *Id.*

Here, the ALJ properly considered the opinions of state agency consultants Dr. Schade and Dr. Robertson, and his RFC determination was consistent with their opinions. The ALJ found both opinions to be consistent with the mixed medical evidence in the record, including citations to those records, and found both opinions to be supported by citations to William's mental status examinations and activities of daily living. (D.E. 6-3 at 29). Thus, he found the opinions generally persuasive. (D.E. 6-3 at 29). However, he disagreed with the opinions to the extent they found only a mild limitation in William's ability to understand, remember, or apply information, instead concluding that William had a moderate limitation in this area of mental functioning. (*Id.*). In their narrative RFC explanation, both Dr. Schade and Dr. Robertson limited William to understanding, remembering, and carrying out simple instructions and completing simple or routine tasks. (D.E. 6-4 at 9, 20). Consistent with this, the ALJ's RFC limited William to understanding, remembering, and carrying out simple, routine instructions, and completing simple work-related decisions. (D.E. 6-3 at 25). Further, consistent with his finding that William had a moderate limitation in his ability to understand, remember, or apply information, the ALJ did not adopt Dr. Robertson's conclusion that William could carry out some complex/detailed instructions and complete some complex/detailed tasks. (*Id.* at 29). Accordingly, the ALJ properly considered and applied the opinions of the state agency consultants when crafting the RFC determination.

However, as in *Martin*, there is a conflict between the limitations the ALJ included in the RFC and the reasoning level required for the jobs he identified in step five. As noted, the ALJ found a higher limitation in his ability to understand, remember, or apply information and, in doing so, implicitly rejected Dr. Robertson's suggestion that William could carry out some complex/detailed instructions and complete some complex/detailed tasks. (D.E. 6-3 at 29). Nonetheless, at step five, the ALJ then identified two potential jobs that, based on their reasoning level of 3, require carrying out detailed instructions. While the ALJ may, in certain circumstances, limit a claimant to "simple" jobs while also identifying jobs that typically require higher reasoning levels, there must be some basis in the vocational expert's testimony to do so. *Pulley*, 2022 WL 1694436 at *9. Here, the vocational expert and ALJ never discussed the reasoning level of the jobs or explained why they would still be suitable for a claimant limited to simple work. Accordingly, as in *Martin*, "the probative value of the vocational expert's testimony is so lessened that remand for lack of substantial evidence should follow." *Martin*, 2020 WL 4382133 at *5.

When he rejected William's first objection to the vocational expert's testimony, the ALJ relied on the SVP level of the listed jobs to conclude that, whatever the reasoning level, they were appropriate for the limitations found. (D.E. 6-3 at 32). However, SVP level and reasoning level are not the same, and the ALJ cannot simply ignore the reasoning levels listed and only rely on the SVP level. *See Hardin v. Astrue*, No. 3:10-CV-1343-B BH, 2011 WL 1630902, at *8 n.5 (N.D. Tex. Mar. 31, 2011) (stating that the reasoning level "should not be ignored or disregarded" and that the SVP level is a distinct concept).

The ALJ also concluded that he could rely on these jobs because the vocational expert stated that her testimony was consistent with the DOT. (D.E. 6-3 at 32). However, when presented with an objection identifying an inconsistency between the DOT and the vocational expert's testimony, the fact that the vocational expert stated that her testimony was consistent with the DOT does not answer the question of whether it actually was. As noted above, to the extent the vocational expert took the reasoning level of these jobs into account, her testimony did not acknowledge or explain why she reached the conclusion that they were suitable despite William's limitations. Absent such an explanation, the vocational expert's testimony does not provide substantial evidence for the ALJ's conclusion at step five. *Martin*, 2020 WL 4382133 at *5.

      c. *Whether the jobs identified by the ALJ at step five of the sequential analysis exist in significant numbers in the national economy*

Finally, William asserts that he submitted a post-hearing memorandum objecting to the vocational expert's job numbers, but the ALJ failed to acknowledge this filing at all. (D.E. 20 at 17-18). He argues that the vocational expert's job numbers for the charge account clerk and food & beverage clerk were vastly overstated, and those jobs are not available in significant numbers in the national economy. (*Id.* at 18-19). William contends that the ALJ was required to consider his properly filed post-hearing memorandum, but failed to do so. (*Id.* at 19-21).

The Commissioner responds that the ALJ properly relied on the vocational expert's testimony in concluding that William could perform other work available in significant numbers in the national economy. (D.E. 26 at 15-16).

William replies that the vocational expert's testimony does not show that she made reasonable adjustments to the number of positions in the national economy for the specific jobs she identified. (D.E. 29 at 10). He argues that he presented evidence, using the same source as the vocational expert, that her job numbers were inflated. (*Id.* at 10-11). William contends that the ALJ improperly failed to consider this evidence in his decision. (*Id.* at 12-15).

"Whenever a VE is used, the [plaintiff] has the right to review and respond to the VE evidence prior to the issuance of a decision." SSR 96-9p, 1996 WL 374185, at *9 n.8 (July 2, 1996). Because the claimant cannot predict what a vocational expert may testify, the "submission and consideration of post-hearing evidence are common in social security disability cases" to rebut such testimony. *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010). Where that evidence is material, the ALJ must consider it and, if he rejects it, explain the reasons for that rejection. *Rodolfo C. v. Kijakazi*, No. EDCV 21-1572-JPR, 2023 WL 8663773, at *3 (C.D. Cal. Feb. 17, 2023).

"The Fifth Circuit has not established a bright-line rule for what constitutes 'significant numbers' of jobs, nor has the court set forth a test for this determination." *Gretta H. v. Kijakazi*, No. 3:21-CV-03052-BT, 2022 WL 18107079, at *4 (N.D. Tex. Dec. 30, 2022). However, courts have concluded that even 16,000 and 17,000 jobs in the national economy were not sufficient to meet this standard. *Id.* (discussing cases).

Here, the ALJ's conclusion at step five of the sequential evaluation is not supported by substantial evidence because the ALJ failed to consider William's argument rebutting

the vocational expert's testimony regarding the number of jobs available in the national economy. William properly submitted a memorandum after the hearing arguing that the vocational expert's statement regarding the number of jobs available was incorrect. (D.E. 6-7 at 117-22); SSR 96-9p, 1996 WL 374185 at *9 n.8. William could not have submitted this argument before or at the hearing because he could not have predicted the content of the vocational expert's testimony. *McClesky*, 606 F.3d at 354. Notably, William submitted another memorandum on a separate issue after the hearing, and the ALJ addressed this argument in his opinion. (D.E. 6-3 at 32). However, the ALJ did not acknowledge or address William's memorandum regarding the number of jobs available in the national economy. (*See id.*). The undersigned makes no determination regarding whose numbers are correct. However, the ALJ was required to resolve this dispute, explain why he either accepted or rejected William's argument, and determine whether the jobs existed in significant numbers in the national economy. *Rodolfo C.*, 2023 WL 8663773 at *3. The lack of this analysis means that the ALJ's conclusion at step five was not supported by substantial evidence for this reason as well.

## IV.    RECOMMENDATION

Accordingly, it is recommended that William's motion (D.E. 20) be **GRANTED in part and DENIED in part**, the Commissioner's motion (D.E. 26) be **GRANTED in part and DENIED in part**, and the Commissioner's denial of disability benefits be **REVERSED AND REMANDED** for further consideration.

Respectfully submitted on July 28, 2025.

_____
Julie K. Hampton
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).